**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| DAVID SEIPLE, | : | CIVIL ACTION |
| **Plaintiff,** | : | |
| | : | |
| v. | : | No.: 19-cv-2946 |
| | : | |
| CRACKER BARREL OLD COUNTRY | : | |
| STORE, INC., | : | |
| **Defendant.** | : | |

**MEMORANDUM**

SITARSKI, M.J.                                                                 April 22, 2021

Presently pending before the Court is Defendant's Motion for Summary Judgment (Def.'s Mot. for Summ. J., ECF No. 27) and Plaintiff's response thereto (Pl.'s Resp., ECF No. 29). For the reasons that follow, Defendant's motion is **GRANTED in part** and **DENIED in part**.

I.      **FACTUAL AND PROCEDURAL HISTORY**

Defendant operates a chain of combined restaurant and gift stores. (Pl.'s Counterstatement of Undisputed Material Facts, ECF No. 29-1, at ¶ P1). In early March 2010, it hired Plaintiff, age 44 at the time, as a Restaurant Manager Trainee. (Def.'s Statement of Undisputed Facts, ECF No. 27, at ¶ 1). Defendant promoted Plaintiff to Associate Manager (AM) after completion of its training program. (Pl.'s Counterstatement of Undisputed Material Facts, ECF No. 29-1, at ¶ P5).

In October 2014, Plaintiff's District Manager (DM), Noelle Olesh, asked Plaintiff to assist at the Hamilton, New Jersey location.[1] (*Id.* at ¶ P8). She informed him that if he did so

---

[1]  DMs and Regional Vice Presidents (RVPs) are responsible for store-level management promotions. (Pl.'s Counterstatement of Undisputed Material Facts, ECF No. 29-1, at ¶ P7).

she would permit him to attend Senior Associate Manager (SAM) Leadership Week.  (*Id.*).

Defendant's "Pathway to Promotion" requires AMs interested in attending SAM Leadership

Week to have fulfilled four criteria:

- Over-all "above standard" in behaviors on most current Performance Evaluation
- Completion of ACT
- AOR Mastery validated by District Manager
- RVP approval[.][2]

(Pathway to Promotion, ECF No. 29-3, at 2).  Plaintiff received "exceeded expectations" on his

then-current evaluation.  (Pl.'s Counterstatement of Undisputed Material Facts, ECF No. 29-1, at

¶ P8).  On January 22, 2015, he completed ACT.[3]  (*Id.*).

The Pathway to Promotion lists "Completion of SAM Leadership Week" as an additional

criterion for promotion to AGM.  (Pathway to Promotion, ECF No. 29-3, at 2).  However, in

January 2015, DM Olesh asked Plaintiff to report to the Mount Laurel, New Jersey location as an

AGM because it had no GM in place.  (*Id.* at ¶ P9).  Plaintiff agreed provided Defendant did not

discriminate against him on the basis of age in considering him for further promotion at the

location.  (*Id.*).  DM Olesh assured Plaintiff he was her "Plan A," and he reported to the Mount

Laurel location as its AGM.  (*Id.*).

---

SAM is the next step in Defendant's management hierarchy, followed by Acting General
Manager (AGM) and then General Manager (GM).  (*Id.* at ¶ P6).

[2] "ACT" stands for "Associate Competency Training."  (Pl.'s Counterstatement of
Undisputed Material Facts, ECF No. 29-1, at ¶ P5).  It "focuse[s] on current operational
processes and initiatives" and is intended to "align with the Performance Management Tool" and
"drive Operational Excellence."  (Pathway to Promotion, ECF No. 29-3, at 2).  The parties do
not define "AOR," but it is intended to "validate mastery prior to SAM Leadership Week."  (*Id.*
at 1).  The promotion policy document defines mastery as "leadership + system mastery +
sustained results."  (*Id.*).

[3] It remains unclear if or when DM Olesh validated Plaintiff's AOR mastery.

In March 2015 Plaintiff completed the five-day SAM Leadership Week.  (*Id.* at ¶¶ P7,

P10).  The SAM Seminar Evaluation form states:

> This participant has completed the SAM Seminar and has been
> exposed to the expectations of a General Manager for Cracker
> Barrel.
> The participant has fulfilled three requirements needed to achieve
> SAM status and must only successfully run a store for 1 to 3
> months and achieve the goals agreed upon with the District
> Manager.

(Mar. 20, 2015 AM Seminar Evaluation, ECF No. 27 at Ex. E).

At SAM Leadership Week Defendant tests each participant's knowledge of seven

"objective[s]/initiatives[s]."  (*Id.*).  Defendant combines these seven test scores into an "Overall"

score.  (*Id.*).  Defendant does not have a written policy requiring a minimum score for promotion

to SAM, and it provides no pass/fail grade at the conclusion of SAM Leadership Week.  (Pl.'s

Counterstatement of Undisputed Material Facts, ECF No. 29-1, at ¶ P11).  Nonetheless, Plaintiff

earned individual scores ranging from 44 percent to 82 percent and an "Overall" score of 62

percent, placing him seventeenth in a class of 18.  (Mar. 20, 2015 AM Seminar Evaluation, ECF

No. 27 at Ex. E).

Defendant also evaluates each participant on a one-through-five scale in three areas:

> Team Player – Remains positive and adapts leadership style to
> inspire, energize and achieve results through others.
>
> Learning Agility – Eager to learn from developmental opportunity.
>
> Participation – Engaged in seminar and added value with both table group and
> class discussions.

(*Id.*).  In each area, Plaintiff received "1 Unacceptable," the lowest score possible.  (*Id.*).

Plaintiff continued as AGM of the Mount Laurel location for an additional five months

after SAM Leadership Week.  (*Id.* at ¶ P16).  During this period, its traffic, restaurant and retail

sales, and profits increased.  (1/31/05 to 7/31/05 Dashboard, ECF No. 29-8).  In July 2015, it had

3

the best food cost numbers in its region, and Defendant recognized it as the region's "Winning Store" for that quarter.  (4th Quarter Scorecard, ECF No. 29-9; EOM Facs RRG05 Rank Report FY15_FM11, ECF No. 29-10; Seiple Dep. Tr., ECF No. 29-2, at 192:18-194:5-195:20).  It also had the highest overall customer satisfaction rating of any location in its district for the third week of August 2015.  (Restaurant District Weekly Side by Side Report, ECF No. 29-11; Seiple Dep. Tr., ECF No. 29-2, at 191:6-192:13).

On August 19, 2015, DM Olesh informed Plaintiff of his demotion to AM at the Trevose, Pennsylvania location, effective September 5, 2015.  (Pl.'s Counterstatement of Undisputed Material Facts, ECF No. 29-1, at ¶ P16).  She cited as the reason for the demotion unspecified "HR issues" at the Mount Laurel location but in a subsequent meeting with Plaintiff changed the reason to his performance under his Individual Development Plan (IDP).  (*Id.* at ¶ P17).  She did not attribute his demotion to his performance at SAM Leadership Week and later acknowledged that Plaintiff had no IDP at the time.  (*Id.*).  Defendant promoted a 28-year-old AM to GM of the Mount Laurel location instead.  (*Id.* at ¶ P18).  Plaintiff was 50 years old at the time.  (*Id.* at ¶ P4).

On December 11, 2015, Plaintiff met with his RVP, Mike Hackney, to discuss his employment situation.  (*Id.* at ¶ P24).  RVP Hackney expressed regret over the handling of the situation and instructed Plaintiff to sign up for the February 2016 SAM Leadership Week as a step toward applying for available GM positions.  (*Id.*).

In March 2016, Plaintiff repeated SAM Leadership Week.  (Mar. 18, 2016 SAM Seminar Evaluation, ECF No. 27 at Ex. E).  He finished sixteenth in a class of 21.  (*Id.*).  He earned an "Overall" knowledge score of 65 percent.  (*Id.*).  He received a rating of "3 Meets Expectations" in "Team Player" and "2 Needs Improvement" in "Learning Agility" and "Participation."  (*Id.*).

Plaintiff subsequently asked DM Olesh if she would certify him for promotion, but she repeatedly responded that she had to check with RVP Hackney.  (Pl.'s Counterstatement of Undisputed Material Facts, ECF No. 29-1, at ¶¶ P26-P27).  RVP Hackney did not know that DM Olesh had stated that the decision was his to make.  (*Id.* at ¶ P27).  In August or September 2017, Plaintiff spoke to the new RVP, Erin Hasselgren, about the situation.  RVP Hasselgren stated that he would check with Human Resources and former RVP Hackney and get back to Plaintiff but did not do so.  (*Id.* at ¶ P28).  On March 31, 2018, Plaintiff notified Defendant of his resignation, and he ceased working for Defendant the next day.  (*Id.* at ¶ 29).

Between 2015 and 2018 Defendant promoted 69 percent of SAM candidates under 40 years old and 55 percent over that age.  (*Id.* at ¶ P30).  Within Plaintiff's district while Olesh was DM, all SAM candidates under 40, but only sixty percent over 40, were promoted.  (*Id.*).  Within Plaintiff's region, eight of the 10 districts tended to promote younger SAM candidates over old ones; in six of the 10 districts, the average age of those promoted was under 40 while the average age of those not promoted was over 40.  (*Id.*).  Two AMs, age 58 and 67, also testified that they had witnessed Defendant promote younger AMs to SAM and GM while they waited for their own promotions.  (*Id.* at ¶ 31).

On October 2, 2020, Defendant filed the instant motion, its supporting memorandum and its statement of facts.  (Def.'s Mot. for Summ. J., ECF No. 27; Def.'s Memo. in Supp. of Mot. for Summ. J., ECF No. 27; Def.'s Statement of Undisputed Facts, ECF No. 27-1).  On November 23, 2020, Plaintiff filed its response and a counterstatement of facts.  (Pl.'s Resp., ECF No. 29; Pl.'s Counterstatement of Undisputed Material Facts, ECF No. 29-1).

## II.   LEGAL STANDARD

Summary judgment shall be granted "if the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P.

56(a).  A fact is "material" if it "might affect the outcome of the suit under the governing law."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).  An

issue is "genuine" if there is sufficient evidence from which a jury could find in favor of the non-

moving party.  *Id.*  It is not the court's role to weigh the disputed evidence and decide which is

more probative, or to make credibility determinations.  Rather, the court must consider the

evidence, and all reasonable inferences which may be drawn from it, in the light most favorable

to the non-moving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-

88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citing *United States v. Diebold, Inc.*, 369 U.S. 654,

655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)); *Tigg Corp. v. Dow Corning Corp.*, 822 F.2d 358, 361

(3d Cir. 1987).  If a conflict arises between the evidence presented by both sides, the court must

accept as true the allegations of the non-moving party, and "all justifiable inferences are to be

drawn in his favor."  *Anderson*, 477 U.S. at 255.

     The moving party bears the initial burden of demonstrating that there is no genuine issue

of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24, 106 S.Ct. 2548, 91 L.Ed.2d 265

(1986).  Once the moving party carries this initial burden, the non-moving party must "come

forward with specific facts showing there is a genuine issue for trial."  *Matsushita Elec. Indus.

Co.*, 475 U.S. at 587.  The non-moving party must present something more than mere

allegations, general denials, vague statements, or suspicions.  *Trap Rock Indus., Inc. v. Local

825, Int'l Union of Operating Eng'rs*, 982 F.2d 884, 890 (3d Cir. 1992); *Fireman's Ins. Co. of

Newark v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982).  Instead, the non-moving party must

present specific facts and "affirmative evidence in order to defeat a properly supported motion

for summary judgment."  *Anderson*, 477 U.S. at 257.  "If the evidence is merely colorable, or is

not significantly probative, summary judgment may be granted."  *Id.* at 249-50.  If the non-

moving party has the burden of proof at trial, then that party must establish the existence of each element on which it bears the burden. *Celotex Corp.*, 477 U.S. at 322-23.


## III.    DISCUSSION

Plaintiff alleges that he was discriminated against due to age in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 *et seq.*, and the Pennsylvania Human Relations Act, 43 P.S. § 951 *et seq.* The same legal standards and analysis apply to claims under these statutes "and hence it is not uncommon to address such claims collectively." *Glanzman v. Metro. Mgmt. Corp.*, 391 F.3d 506, 509 n.2 (3d Cir. 2004) (citing *Bailey v. Storlazzi*, 729 A.2d 1206 (Pa. Super. 1999)). Plaintiff asserts claims under disparate-treatment and disparate-impact[4] theories. Before considering the merits of Defendant's motion for summary judgment, however, the Court must address Plaintiff's contention that the motion is improper because he awaits discovery from Defendant.

### A.    Incomplete Discovery

As a threshold matter, Plaintiff argues that I am "justified in not granting the motion" because he "has still not received full and complete responses to Plaintiff's July 30, 2020 Supplemental Request for Production of Documents . . . ." (Pl.'s Resp., ECF No. 29, at 19-20 (citing *Doe v. Abington Friends Sch.*, 480 F.3d 252, 257 (3d Cir. 2007))). Federal Rule of Civil Procedure 56(d) provides:

---

[4] It is not clear from the face of the complaint that Plaintiff asserts a claim under a disparate-impact theory. (*See generally* Compl., ECF No. 1). Nonetheless, in his response, Plaintiff confirms his intention to assert a claim under this theory and points to evidence purportedly establishing a prima facie case. (Pl.'s Resp., ECF No. 29, at 18-19). "[T]he Court will consider such a claim since the complaint is unclear and the Court must draw all inferences in favor of the nonmoving party on summary judgment." *Rumph v. State Workmen's Ins. Fund*, 964 F. Supp. 180, 187 (E.D. Pa. 1997).

> If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:
>
> > (1) defer considering the motion or deny it;
> >
> > (2) allow time to obtain affidavits or declarations or to take discovery; or
> >
> > (3) issue any other appropriate order.

FED. R. CIV. P. 56(d).  Plaintiff attaches a supporting declaration from his counsel.  (Charles Decl., ECF No. 29-24).

"The purpose of Rule 56(d) is to help ensure that summary judgment motions are brought and considered at an appropriate time."  11 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 56.100[1] (Matthew Bender 3d ed. 1999) (citation omitted).  "Specifically, Rule 56(d) is addressed to so-called 'premature' summary judgment motions."  *Id.* (citation omitted).  Pursuant to Rule 56(b), "a party may move for summary judgment as soon as the case is filed, without waiting for discovery to begin, let alone to run its full course."  *Id.* (citation omitted).  Rule 56(d) acts "as a critical counterbalance to the fact that Rule 56[(b)] allows summary judgment motions to be filed early in the case."  *Id.* (citation omitted).  It protects "parties who have not yet had a reasonable opportunity to take the discovery that they would need to gather the evidence necessary to oppose the motion."  *Id.* (citation omitted).  "On the other hand, if a party has had a reasonable opportunity to explore the issues, summary judgment is not premature even if the discovery period has not closed."  *Id.* (citation omitted).

On July 30, 2020, the day before the thrice-extended deadline, Plaintiff served the discovery requests at issue.  (Charles Decl., ECF No. 29-24, at ¶ 3; *see also* Sch. Order, ECF No. 10; Am. Sch. Order, ECF No. 15; Am. Sch. Order, ECF No. 17; Am. Sch. Order, ECF No. 23).  Plaintiff's untimely service of the requests alone constitutes a basis to reject his argument that the Court should deny Defendant's motion in its entirety because discovery is incomplete.  *See*

*Thomas v. Pacificorp*, 324 F.3d 1176, 1179 (10th Cir. 2003) ("[R]equests must be served at least thirty days prior to a completion of discovery deadline.  Therefore, we hold that the district court did not abuse its discretion in determining that discovery was completed before granting summary judgment.") (internal citation omitted).  Further, this case does not involve a "premature" motion for summary judgment as contemplated by Rule 56(d).  Defendant filed its motion for summary judgment at the dispositive motion filing deadline, which the Court had extended four times.  (Sch. Order, ECF No. 10; Am. Sch. Order, ECF No. 15; Am. Sch. Order, ECF No. 17; Am. Sch. Order, ECF No. 23; Order, ECF No. 26).  On November 23, 2020, Plaintiff filed its response, claiming that it has received some, but not all, documents responsive to the Supplemental Requests.  (Pl.'s Resp., ECF No. 29, at 19-20; *see also* Charles Decl., ECF No. 29-24, at ¶ 6).  Five months have elapsed since that filing, and it is unclear whether Plaintiff maintains that it still has not obtained all discoverable materials.  However, in light of the repeated discovery and motion extensions in this case, and Defendant's filing of its summary judgment motion at the court-ordered deadline, Plaintiff has had a "reasonable opportunity" to obtain necessary discovery in this matter.  *See* 11 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 56.100[1].  As such, the Court will consider Defendant's motion on its merits.

### B.  Disparate Treatment

#### 1.  Background Law

To prevail on a claim for disparate treatment, a plaintiff must show that "the protected trait actually motivated the employer's decision."  *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993); *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 141, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).  This showing that a protected trait had a determinative influence on the decision of the employer can be made either through the use of direct evidence or circumstantial evidence.  *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994).

A claim based upon direct evidence must meet the standard set out in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), *superseded by statute on other grounds as stated in Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, __ U.S. __, 140 S.Ct. 1009, 1017 (2020). Under *Price Waterhouse*, direct evidence is evidence that would be "sufficient to allow the jury to find that decision makers placed a substantial negative reliance on Plaintiff's age." *Fakete v. Aetna, Inc.*, 308 F.3d 335, 338 (3d Cir. 2002), *abrogated on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 167, 129 S.Ct. 2343, 2350, 174 L.Ed.2d 119 (2009). This finding requires that a plaintiff present evidence of "discriminatory attitudes" that were causally related to the challenged employment decision. *Glanzman*, 391 F.3d at 512. If direct evidence is presented the burden of persuasion on the issue of causation shifts, and the employer must prove that it would have taken the same action even if it had not considered the plaintiff's age. *Id.* at 338 (citing *Price Waterhouse*, 490 U.S. at 265-266).

If there is no direct evidence of discrimination a plaintiff may present circumstantial evidence of discrimination. *Fuentes*, 32 F.3d at 764. If circumstantial evidence is presented, a plaintiff must satisfy the standard set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Embrico v. U.S. Steel Corp.*, 245 F. App'x. 184, 187 (3d Cir. 2007); *see also Glanzman*, 391 F.3d at 512. *McDonnell Douglas* requires that a plaintiff show that (1) he is a member of a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) similarly situated persons who are not members of the protected class were treated more favorably. *See Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 410-11 (3d Cir.1999). "[T]he prima facie case under the *McDonnell Douglas* pretext framework is not intended to be onerous." *Sempier v. Johnson & Higgins*, 45 F.3d 724, 728 (3d Cir. 1995) (citing *Burdine*, 450 U.S. at 253). In an age discrimination case, it requires the plaintiff to show that he: (1) is at least 40 years old; (2) is qualified for the position in question;

(3) suffered an adverse employment decision; and (4) was replaced by a sufficiently younger person to permit an inference of age discrimination.  *Brewer v. Quaker State Oil Refining Corp.*, 72 F.3d 326, 330 (3d Cir. 1995); *Barber v. CSX Distrib. Servs.*, 68 F.3d 694, 698 (3d Cir. 1995).

If a plaintiff meets the *McDonnell Douglas* standard, the burden of production shifts to the employer who must come forward with a legitimate, nondiscriminatory reason for the adverse employment decision.  *Goosby v. Johnson & Johnson Med., Inc.*, 228 F.3d 313, 318-19 (3d Cir. 2000) (citing *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 254–56, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)).  The employer is not required to prove that this nondiscriminatory reason actually motivated the action in order to shift the burden back to the plaintiff.  *Fuentes*, 32 F.3d at 763.

If a defendant offers a legitimate, non-discriminatory reason for its actions, the plaintiff survives summary judgment only by "present[ing] sufficient evidence to raise a genuine issue of fact as to whether the defendant's proffered reasons were not its true reasons for the challenged employment action."  *Stewart v. Rutgers*, 120 F.3d 426, 433 (3d Cir. 1997); *see also Jones*, 198 F.3d at 413.  Thus, a plaintiff survives summary judgment by proffering "admissible evidence[ ] that the employer's articulated reason was not merely wrong, but that it was so plainly wrong that it cannot have been the employer's real reason," or by "pointing to evidence in the record which allows the fact finder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action."  *Jones*, 198 F.3d at 413.  To discredit a legitimate reason proffered by an employer, a plaintiff must present evidence demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence."  *Fuentes*, 32 F.3d at 765.

In attempting to discredit a defendant's proffered reasons, however, a plaintiff cannot simply show that the defendant's decisions were wrong or mistaken.  The inquiry is whether the defendant was motivated by discriminatory animus, not whether the defendant was wise, shrewd, prudent or competent.  *See Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1109 (3d Cir. 1996) ("federal courts are not arbitral boards ruling on the strength of the 'cause' for the [adverse employment action].  The question is not whether the employer made the best, or even a sound, business decision; it is whether the real reason is discrimination."); *see also Ezold v. Wolf, Block, Schorr & Solis–Cohen*, 983 F.2d 509, 531, 533 (3d Cir. 1992).

Significantly, the ultimate burden of persuasion always remains with the plaintiff, and the ultimate question is whether, after all the evidence is in, the plaintiff has proven his case by a preponderance of the evidence.  *Aikens*, 460 U.S. at 711.  Even during the pretextual analysis, the employer has no burden to prove that its proffered reasons are true; rather, the plaintiff must prove by a preponderance of the evidence that the proffered reasons are pretextual.  *Burdine*, 450 U.S. at 256.

## 2.    Application

Because Plaintiff submits circumstantial, rather than direct, evidence of discrimination, the Court must analyze this case pursuant to the burden-shifting framework set forth in *McDonnell Douglas*.  (*See* Pl.'s Resp., ECF No. 29 ("most age cases proceed on the basis of circumstantial rather than direct evidence and follow the familiar pattern of the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973) analysis applicable in other types of discrimination cases")).  This framework requires that I first determine whether Plaintiff has submitted evidence supporting the four elements of a prima facie case.  *Jones*, 198 F.3d at 410-11.

First, Plaintiff was 50 years old when Defendant returned him to AM instead of promoting him to SAM or GM.  (Pl.'s Counterstatement of Undisputed Material Facts, ECF No. 29-1, at ¶ P4).  Second, he has produced evidence that he was qualified to remain in his AGM position.  He points to various metrics that improved while he was AGM of the Mount Laurel location compared to the six months prior to his arrival there.  (*Id.* at ¶¶ 7, P15).  He has also produced evidence that he was qualified for promotion to SAM or GM.  He attended SAM Leadership Week (twice) and operated a store, successfully according to the cited metrics, for more than the required one to three months.  (*Id.* at ¶¶ 4, P10, P25).  Third, both his demotion to AM and the refusal to promote him constitute adverse employment actions.  *See Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 644 n.5 (3d Cir. 1998) (demotion may be adverse employment action); *Keister v. PPL Corp.*, No. 4:13-cv-00118, 2014 WL 2708311, at *3 (M.D. Pa. June 13, 2014) (refusal to promote may be adverse employment action).  Fourth, Plaintiff's replacement by someone 22 years younger than him suffices to support an inference of age discrimination.  *See Maxfield v. Sinclair Int'l*, 766 F.2d 788, 793 (3d Cir. 1985) (similar age disparity sufficient).  Accordingly, Plaintiff has offered evidence supporting the four requirements of his prima facie case.

Next, I must consider whether Defendant can point to a legitimate, nondiscriminatory reason for its actions.  *Goosby*, 228 F.3d at 318-19 (citing *Burdine*, 450 U.S. at 254-56).  Defendant cites two reasons:  Plaintiff's performance as AGM and at SAM Leadership Week.  (Def.'s Memo. in Supp. of Mot. for Summ. J., ECF No. 27, at 8).  According to DM Olesh, the Mount Laurel location "went backwards" with Plaintiff as AGM, and the location's metrics and Plaintiff's "coaching reports" "weren't where they needed to be."  (Olesh Dep. Tr., ECF No. 27 at Ex. D, at 120:1-11).  Plaintiff also "performed poorly" both times at SAM Leadership Week, finishing in the bottom third or worse of his class and primarily receiving ratings of

"Unacceptable" or "Needs Improvement" on his seminar evaluations.  (Def.'s Statement of Undisputed Facts, ECF No. 27-1, at ¶¶ 6, 9; Mar. 20, 2015 and Mar. 18, 2016 SAM Seminar Evaluations, ECF No. 27 at Ex. E).  These reasons call into question Plaintiff's ability to continue as AGM or advance to SAM or GM and bear no connection to Plaintiff's age.  Thus, Defendant has provided evidence of legitimate, nondiscriminatory reasons for its adverse employment actions against Plaintiff.

The burden now shifts to Plaintiff to offer evidence (1) that these reasons were "so plainly wrong" that they could not have been Defendant's actual reasons for the adverse actions or (2) that would allow the jury to infer that discrimination was likely a motivating cause behind the actions.  *Jones*, 198 F.3d at 413.  The Court finds that Plaintiff has carried this burden as to his demotion, but not as to Defendant's refusal to promote him.

Nowhere in its statement of facts, supporting memorandum or cited evidence does Defendant contend that it demoted Plaintiff because of his poor performance at SAM Leadership Week.  Rather, Defendant claims Plaintiff was demoted to AM because of his allegedly poor performance as AGM of the Mount Laurel location.  (*See* Def.'s Memo. in Supp. of Mot. for Summ. J., ECF No. 27, at 8-9 (citing Olesh Dep. Tr., ECF No. 27 at Ex. D, at 120:1-121:1)).  Thus, as to Plaintiff's demotion, the Court considers only whether Plaintiff has introduced evidence that would permit the jury to find this reason "unworthy of credence" and conclude instead that Defendant's real reason for demoting Plaintiff was discrimination.  *Keller*, 130 F.3d at 1109; *Fuentes*, 32 F.3d at 765.

Defendant's only evidence in support of its contention that it demoted Plaintiff to AM due to his poor performance as AGM comes from DM Olesh's deposition testimony.  (*See* Def.'s Memo. in Supp. of Mot. for Summ. J., ECF No. 27, at 8-9 (citing Olesh Dep. Tr., ECF No. 27 at Ex. D, at 120:1-121:21)).  DM Olesh testified that the Mount Laurel location "went backwards"

under Plaintiff's management, but she failed to explain that assessment and offered no specifics in support of it. (Olesh Dep. Tr., ECF No. 27 at Ex. D, at 120:4-5). She claimed that the Mount Laurel location's metrics and Plaintiff's coaching reports "weren't where they needed to be," but she never indicated what these metrics and reports showed, let alone which specific ones she was referencing or "where they needed to be." (Olesh Dep. Tr., ECF No. 27 at Ex. D, at 120:1-121:1). She stated that the results produced by Plaintiff as AGM failed to meet expectations and that she had "a lot of . . . discussions" with Plaintiff about those results, but she never stated what results were achieved or expected. (*See id.* at 120:8-10 ("or whatever information it is that we're looking at to measure his results based off what the expectations were")). She testified that she and Plaintiff discussed "staffing and turnover and how many people you hired, how many people you termed, [and] why you termed them," but she did not indicate which, if any, of this information indicated that Plaintiff performed poorly as AGM. (*Id.* at 120:20-24). DM Olesh's assessment that the Mount Laurel location "went backwards" under Plaintiff's management lacks factual support and, as set forth below, conflicts with the evidence provided by Plaintiff. (*Id.* at 120:4-5).

Plaintiff points to a variety of evidence tending to demonstrate that he performed competently as AGM of the Mount Laurel location. During his time as AGM, the store increased its traffic, its restaurant and retail sales, and its profits. (1/31/05 to 7/31/05 Dashboard, ECF No. 29-8). Some of Defendant's stores in the district saw greater increases in these metrics, but others saw smaller increases, or even decreases. (*Id.*). In July 2015, during Plaintiff's tenure as AGM, the Mount Laurel location also had the best food cost numbers of the 70-plus stores in the region. (EOM Facs RRG05 Rank Report FY15_FM11, ECF No. 29-10; Seiple Dep. Tr., ECF No. 29-2, at 192:18-194:5). Indeed, based on these and other metrics, Defendant recognized the Mount Laurel location as the "Winning Store" in its region during the May to

July 2015 period and placed $2000 in its bonus pool.[5]  (4th Quarter Scorecard, ECF No. 29-9; Seiple Dep. Tr., ECF No. 29-2 at 194:6-195:20).  During the week of August 15 to 21, 2015 – the very week that Defendant notified Plaintiff of his demotion – the Mount Laurel location received the highest overall customer satisfaction rating in the district.  (Restaurant District Weekly Side by Side Report, ECF No. 29-11; Seiple Dep. Tr., ECF No. 29-2, at 191:6-192:13).

Accordingly, as to his demotion, Plaintiff has "present[ed] sufficient evidence to raise a genuine issue of fact as to whether the defendant's proffered reasons were not its true reasons for the challenged employment action."  *See Stewart*, 120 F.3d at 433.  In light of the cited metrics and the recognition the Mount Laurel location earned with Plaintiff as its AGM, a jury could find that Defendant's stated reason for his demotion to AM – his allegedly poor performance as AGM of the Mount Laurel location – is so "plainly wrong" that it could not have served as Defendant's true reason for the adverse employment action.  *See Jones*, 198 F.3d at 413.

Defendant's refusal to promote Plaintiff, however, is a different matter.  Defendant states that it passed Plaintiff over for promotion not only because of his performance as AGM, but also because of his performance at SAM Leadership Week.  (Def.'s Memo. in Supp. of Mot. for Summ. J., ECF No. 27, at 8).  The first time he attended SAM Leadership Week in March 2015, Plaintiff finished seventeenth in a class of 18.  (Mar. 20, 2015 SAM Seminar Evaluation, ECF No. 27 at Ex. E).  His "knowledge score" was 62 percent.  (*Id.*).  Plaintiff also earned the lowest possible score, "1 Unacceptable," in all three areas of evaluation, Team Player, Learning Agility and Participation.  (*Id.*).

Plaintiff fared only marginally better when he attended SAM school a year later, despite having attended previously.  This time, he finished sixteenth in a class of 21.  (Mar. 18, 2016

---

[5]  The GM has a right to 60 percent of a location's bonus pool.  (Seiple Dep. Tr., ECF No. 29-2 at 54:24-55:1.)  He or she has discretion to distribute the remaining 40 percent among the location's AMs.  (*Id.* at 54:6-12).

SAM Seminar Evaluation, ECF No. 27 at Ex. E).  His knowledge score improved only three percentage points, to 65 percent.  (*Id.*).  Plaintiff increased his "Team Player" rating to "3 Meets Expectations," but he earned only "2 Needs Improvement" in "Learning Agility" and "Participation."  (*Id.*).

Plaintiff seizes upon the fact that the SAM Leadership Week evaluation form states that "[t]he participant has fulfilled three requirements needed to achieve SAM status and must only successfully run a store for 1 to 3 months and achieve the goals agreed upon with the District Manager."  (Pl.'s Counterstatement of Undisputed Material Facts, ECF No. 29-1, at ¶ P10 (quoting Mar. 20, 2015 and Mar. 18, 2016 SAM Seminar Evaluations, ECF No. 27 at Ex. E)).  In Plaintiff's view, because he had already successfully managed the Mount Laurel location for more than three months, mere "completion of SAM Leadership Week [was] all that [was] required" of him for promotion.  (Pl.'s Resp., ECF No. 29, at 15).  He notes that Defendant has no written policy setting forth minimum scores or ratings required for promotion and points to the deposition testimony of Daniel McChurch, Defendant's employee who designed and managed SAM Leadership Week, that participants receive no pass/fail grade.  (Pl.'s Counterstatement of Undisputed Material Facts, ECF No. 29-1, at ¶ P11 (citing McChurch Dep. Tr., ECF No. 29-4, at 25:16-18)).  He contends that DM Olesh "unreasonably denied" his promotion notwithstanding his fulfillment of this final requirement.  (Pl.'s Counterstatement of Undisputed Material Facts, ECF No. 29-1, at ¶ P10).

But Plaintiff's issues with Defendant's statement of its promotion policy do not render its proffered legitimate nondiscriminatory reason – Plaintiff's poor performance at SAM Leadership Week – so full of "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" that a reasonable jury could find it "unworthy of credence."  *Fuentes*, 32 F.3d at 765.  By Plaintiff's logic, he could have earned a knowledge score of zero and received all "1

Unacceptable" ratings (as he in fact did during his first SAM Leadership Week), but Defendant would nonetheless have had to promote him because Plaintiff had "completed" SAM Leadership Week, in addition to the other requirements for promotion.  If Plaintiff were correct, grading, rating and ranking participants would seem to serve little purpose, nor would any reason have existed to send Plaintiff back to SAM Leadership Week a second time.  Plaintiff would have qualified for promotion based upon his completion of SAM Leadership Week the first time.  This strained argument does not convince the Court that a reasonable jury could conclude that Defendant's real reason for refusing to promote him was age discrimination rather than Plaintiff's poor performance at SAM Leadership Week.  *See Keller*, 130 F.3d at 1109.

Plaintiff complains that in conversations with his superiors about being passed over for promotion they never cited his poor performance at SAM Leadership Week.  (Pl.'s Resp., ECF No. 29, at 13-16).  He contends that DM Olesh told him at the time of his demotion that it was due to "HR issues" at the Mount Laurel location and then, in a subsequent conversation, that it was due to his performance under his IDP, but she later acknowledged that no such issues existed and Plaintiff had no IDP.  (*Id.* at 12-13).  Citing cases from the Seventh and Tenth Circuits, Plaintiff argues that "[p]retext can be established where the employer changes its reasons for the termination as an after-the-fact justification" and that "[t]he timing of the change has been found to support the inference of pretext when it occurs after significant legal proceedings have occurred."  (*Id.* (citing *Jaramillo v. Colo. Jud. Dep't*, 427 F.3d 1303, 1310 (10th Cir. 2005); *Zaccagnini v. Charles Levy Circulating Co.*, 338 F.3d 672, 678 (7th Cir. 2003))).

In *Jaramillo*, the Tenth Circuit observed that "[i]n some cases . . . a successful attack on part of the employer's legitimate, non-discriminatory explanation is enough to survive summary judgment even if one or more of the proffered reasons has not been discredited."  427 F.3d at

1310. One such instance occurs when "the employer has changed its explanation under circumstances that suggest dishonesty or bad faith . . . ." *Id.* (citing *Cole v. Ruidoso Mun. Schs.*, 43 F.3d 1373, 1380-81 (10th Cir. 1994)). However, "the mere fact that [an employer] has offered different explanations for its decision does not create a genuine question of pretext." *Id.* When an employer changes its explanation, a court should consider two factors: "(1) the timing of the change in position and (2) the evidentiary basis for the new rationale." *Id.* (citing *Perfetti v. First Nat'l Bank*, 950 F.2d 449, 456 (7th Cir. 1991)). "If at the time of the adverse employment decision the decision-maker gave one reason, but at the time of the trial gave a different reason which was unsupported by the documentary evidence, the jury could reasonably conclude that the new reason was a pretextual after-the-fact justification." *Id.* (quoting *Perfetti*, 950 F.2d at 456).

Nonetheless, even where the timing of a change in the defendant's explanation for an adverse employment action "could raise some suspicion," the court should grant summary judgment in its favor where its "rationale is supported by the record." *Id.* at 1312. Indeed, in *Jaramillo,* the Tenth Circuit affirmed the district court's grant of summary judgment in the defendant's favor for this reason. *Id.* (finding that the defendant's rationale change did not raise a genuine issue of material fact as to whether the new rationale was a pretext where it was "supported by the record"). *Jaramillo* also distinguished Plaintiff's other cited case, *Zaccagnini*, on this basis. *Id.* ("In *Zaccagnini*, the plaintiff introduced evidence that undermined *both* of the employer's rationales." (citing *Zaccagnini*, 338 F.3d at 678)) (emphasis added). Here, as noted, the record supports Defendant's proffered legitimate nondiscriminatory reason – Plaintiff's poor performance at SAM Leadership Week – and Plaintiff has failed to introduce evidence that would permit a reasonable jury to conclude that his performance was not Defendant's real reason for refusing to promote him. The *Jaramillo* court also noted that *Zaccagnini* is further

distinguishable because the defendant in that case never raised its relied-upon legitimate nondiscriminatory reason until its reply in support of its summary judgment motion. *Id.* (citing 338 F.3d at 676). On the contrary, Defendant has relied upon Plaintiff's poor showing at SAM Leadership Week since at least its earliest filing in this case.[6] (*See* Def.'s Answer with Aff. Defenses, ECF No. 4, at ¶¶ 28, 42; *see also* Rpt. of R. 26(f) Mtg., at 2). I pass no judgment on whether Defendant's decision not to promote Plaintiff because of his performance at SAM Leadership Week represents "the best, or even a sound business decision . . . ." *Keller*, 130 F.3d at 1109. However, no reasonable jury could find that "the real reason [was] discrimination." *Id.*

In short, Plaintiff has provided evidence that would permit a reasonable jury to conclude that Defendant's proffered reason for Plaintiff's demotion, but not the decision to pass him over for a promotion, was pretextual. Plaintiff's evidence of his successful operation of the Mount Laurel location raises a jury question as to whether the alleged fact that the store "went backwards" – as opposed to age discrimination – was the true reason for his demotion to AM. However, Plaintiff fails to introduce evidence from which a reasonable jury could conclude that Defendant passed him over for a promotion due to age discrimination rather than his performance at SAM Leadership Week. Accordingly, I shall grant Defendant's motion for summary judgment on Plaintiff's disparate-treatment claim as to the refusal to promote him only.

### C.   Disparate Impact

#### 1.   Background Law

"Unlike claims of disparate treatment, disparate-impact claims do not require proof of discriminatory intent." *Karlo v. Pittsburgh Glass Works, LLC*, 849 F.3d 61, 69 (3d Cir. 2017).

---

[6] The record does not reflect whether Defendant raised the issue of Plaintiff's SAM Leadership Week performance in its defense of Plaintiff's underlying Pennsylvania Human Rights Commission and Equal Employment Opportunity Commission complaints. (*See* Compl., ECF No. 1, at ¶ 7(c)-(d); Def.'s Answer with Aff. Defenses, ECF No. 4, at ¶ 7(c)-(d)).

The legal theory "redresses policies that are 'fair in form, but discriminatory in operation.'" *Id.* (quoting *Griggs v. Duke Power Co.*, 401 U.S. 424, 431, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971)). Thus, "disparate-impact claims 'usually focus[ ] on statistical disparities . . . .'" *Id.* (quoting *Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977, 987, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988)).

A prima facie case for disparate impact under the ADEA requires a plaintiff to "(1) identify a specific, facially neutral policy, and (2) proffer statistical evidence that the policy caused a significant age-based disparity." *Id.* (quoting *NAACP v. N. Hudson Reg'l Fire & Rescue*, 665 F.3d 464, 476-77 (3d Cir. 2011)).  Identification of a specific practice "guards against 'the myriad of innocent causes that may lead to statistical imbalances.'" *Id.* (quoting *Smith v. City of Jackson, Miss.*, 544 U.S. 228, 241, 125 S.Ct. 1536, 161 L.Ed.2d 410 (2005)) (additional citation omitted).  Nor is identification of a specific practice a "trivial burden . . . ." *Id.* (quoting *Meacham v. Knolls Atomic Power Lab.*, 554 U.S. 84, 101, 128 S.Ct. 2395, 171 L.Ed.2d 283 (2008)).  "[A] disparate-impact claim that relies on a statistical disparity must fail if the plaintiff cannot point to a defendant's policy or policies causing that disparity." *Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmties. Project, Inc.*, 576 U.S. 519, 542, 135 S.Ct. 2507, 192 L.Ed.2d 514 (2015).

"Furthermore, not just any disparity will make out the prima facie case . . . ." *Karlo*, 849 F.3d at 79.  Although no "uniform rule" exists, and the disparity "must be evaluated 'on a case-by-case basis,'" it also "must be significant." *Id.* (quoting *Watson*, 487 U.S. at 995 n.3).  The disparity "must be sufficiently substantial that [it] raises . . . an inference of causation." *Watson*, 487 U.S. at 995; *see also Hazelwood Sch. Dist. v. United States*, 433 U.S. 299, 307-08, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977) (requiring "gross statistical disparities").

"[I]f an employer can provide no reasonable justification for a policy that creates a significant age-based disparity, the ADEA prohibits that policy." *Karlo*, 849 F.3d at 80.

21

However, an employer may defend against a plaintiff's prima facie case "by arguing that the challenged practice was based on 'reasonable factors other than age' – commonly referred to as the 'RFOA' defense." *Karlo*, 849 F.3d at 69 (quoting 29 U.S.C. § 623(f)(1); 29 C.F.R. § 1625.7). An RFOA "is a non-age factor that is objectively reasonable when viewed from the position of a prudent employer mindful of its responsibilities under the ADEA under like circumstances." 29 C.F.R. § 1625.7(e)(1). "Whether a differentiation is based on reasonable factors other than age must be decided on the basis of all the particular facts and circumstances surrounding each individual situation." *Id.* "To establish the RFOA defense, an employer must show that the employment practice was both reasonably designed to further or achieve a legitimate business purpose and administered in a way that reasonably achieves that purpose in light of the particular facts and circumstances that were known, or should have been known, to the employer." *Id.*

"[T]he RFOA defense imposes a relatively light burden on employers." *Karlo*, 849 F.3d at 80 (citing *Smith*, 544 U.S. at 243). "If a company's oldest employees are inadvertently disadvantaged by a merit-based policy, for example, the RFOA defense is designed to address just such a scenario." *Id.* (citing *Smith*, 544 U.S. at 229).

### 2. Application

Plaintiff alleges that Defendant's "Pathway to Promotion" policy and SAM Leadership program are facially neutral but "have caused a significant age-based disparity" in the promotion of SAM candidates. (Pl.'s Resp., ECF No. 29, at 18). Plaintiff points to data produced by Defendant showing that between 2015 and 2018 it promoted 69 percent of SAM candidates under 40 years old, but only 55 percent over that age. (*Id.* (citing SAM Candidate Summary and Spreadsheet, ECF No. 29-6)). Within the district in which Plaintiff worked, one hundred percent of SAM candidates under age 40 were promoted under DM Olesh, but only 60 percent of those

over age 40 were.  (*Id.* (citing SAM Candidate Summary and Spreadsheet, ECF No. 29-6)).

Within the 10 districts in Plaintiff's region, eight favored younger SAM candidates for

promotion over old ones; in six districts, the average age of those promoted was under 40, while

the average age of those not promoted was over 40.  (*Id.* (citing SAM Candidate Summary and

Spreadsheet, ECF No. 29-6)).  For purposes of this motion only, and because the evidence in any

event establishes an RFOA defense to Plaintiff's claim, the Court assumes that these age

disparities are sufficiently significant to raise "an inference of causation" and establish Plaintiff's

prima facie case.  *See Watson*, 487 U.S. at 995.

However, no reasonable jury could find that these disparities are not due to "reasonable

factors other than age."[7]  *See* 29 U.S.C. § 623(f)(1); 29 C.F.R. § 1625.7.  Defendant's promotion

policy, including its SAM Leadership training incorporated therein, is reasonably designed to

achieve legitimate business purposes.  Its "Pathway to Promotion" document sets forth four

"Purpose[s]" behind the policy:

- Improve the Guest Experience and Stake Holders returns by aligning the development of Associate and Senior Associate Managers with performance criteria and current business initiatives.
- Ensure that Associate Managers promoted to SAM have developed and demonstrated systems mastery.
- Provide a system of annual recertification that verifies and builds operational excellence.
- Provide a developmental structure to keep the bench strength pipeline full to fill future GM position needs.

(Pathway to Promotion, ECF No. 29-3, at 1).

---

[7]  As noted, it only became clear in Plaintiff's response to Defendant's motion for summary judgment that he intended to assert claims under a disparate impact theory.  (Pl.'s Resp., ECF No. 29, at 18-19; *see supra* n.5; *see generally* Compl., ECF No. 1).  Accordingly, Defendant did not include argument in its memorandum as to this theory.  In fairness to Defendant, the Court shall consider the record evidence to determine if it establishes an RFAO defense to Plaintiff's disparate impact claim.

To further these purposes, the policy requires AMs interested in attending SAM

Leadership Week to have fulfilled four criteria:

- Over-all "above standard" in behaviors on most current
  Performance Evaluation
- Completion of ACT
- AOR Mastery validated by District Manager
- RVP approval[.]

(Pathway to Promotion, ECF No. 29-3, at 2).

SAM Leadership Week is also designed to foster Defendant's legitimate business

purposes.  To this end, it focuses on:

- analysis of Cracker Barrels [sic] key business drivers (i.e.
  Guest Loyalty, Recipe Right, Rising Star, Operational
  Excellence[,] etc.)
- achieving results through your management team:
  - effective one on one's and Manager Meetings
  - Daily coaching
  - IDP/PIP
- financial analysis and reporting including MOP calls
- Title II and VII
- Using the Managers Schedule to execute the business plan[.][8]

(Pathway to Promotion, ECF No. 29-3, at 2).

Participants have their knowledge tested in seven areas: Policies; Finance; Absolutes &

Guiding Principles; Controllables; ER, GR, LP; Company Initiatives; and ESM & Coaching.[9]

(Mar. 20, 2015 and Mar. 18, 2016 SAM Seminar Evaluations, ECF No. 27 at Ex. E).  Each

participant's results are aggregated into an "Overall" score and the participant is ranked against

their class members.  (*Id.*).  He or she is also evaluated on a one-through-five scale in three areas:

Team Player, Learning Agility and Participation.  (*Id.*).

---

[8] The parties do not explain what "PIP" or "MOP" means.

[9] Again, the parties do not explain what these abbreviations mean.

SAM Leadership Week participants also "create a 30-90 day business plan to be executed during his her acting GM role . . . ."  (Pathway to Promotion, ECF No. 29-3, at 2).  In addition, "Management Development follow[s] up with each participant's RVP and to discuss performance."  (*Id.*).

After the completion of SAM Leadership Week, candidates who have fulfilled all other criteria as well are placed in an AGM role to operate a store for 30 to 90 days.  (*Id.* at 2-3).  At the conclusion of the "store run," the RVP interviews the candidate to measure his or her "execution of the business plan," "ability to lead through the associate team," and "performance of operational initiatives (i.e. Recipe Right, Medallion, Rising Star, etc.)."  (*Id.* at 3).

No reasonable jury could conclude that Defendant has not designed this policy to achieve and further the legitimate business purposes set forth at the beginning of the "Pathway to Promotion" document.  By requiring SAM candidates to complete training on Defendant's operational processes and initiatives, demonstrate mastery of its systems, participate in SAM Leadership Week, create a business plan, and implement it during a "store run," the promotion policy is reasonably designed to implement its stated purposes of improving customer satisfaction and stakeholder returns, evaluating candidates for promotion against performance criteria, ensuring system mastery, and developing a structure to keep a pipeline of qualified GM candidates.  (Pathway to Promotion, ECF No. 29-3, at 1).  Thus, the Court next considers whether a jury could find that Defendant did not actually "administer[ ] [the policy] in a way that reasonably achieves" these purposes.  29 C.F.R. § 1625.7(e)(1).

The record evidence makes clear that Defendant also administers its promotion policy in such a way as to fulfill its stated purposes.  Through its "Dashboard" system, Defendant evaluates the performance of GMs – including AGMs awaiting promotion – at least every six months based on several metrics, including customer complaints, restaurant and retail sales,

profits, food costs, and employee turnover.  (1/31/05 to 7/31/05 Dashboard, ECF No. 29-8; *see also* EOM Facs RRG05 Rank Report FY15_FM11, ECF No. 29-10; Restaurant District Weekly Side by Side Report, ECF No. 29-11).  It also keeps quarterly "Scorecards" for stores and awards financial bonuses to incentivize excellence in store operation.  (4th Quarter Scorecard, ECF No. 29-9; Seiple Dep. Tr., ECF No. 29-2 at 194:6-195:20).

In addition, Defendant administers SAM Leadership Week in a way that reasonably furthers its legitimate business objectives.  RVP Hackney testified that "multiple people" are "involved in th[e] assessments" of candidates made at SAM Leadership Week and that "[t]his isn't one person" assessing candidates.  (Hackney Dep. Tr., ECF No. 29-22, at 35:14-16).  He explained that SAM Leadership Week helps Defendant determine which candidates may be ready for promotion to SAM, but also which ones are not: "[Y]ou would not present someone for promotion that needs improvement in . . . leadership characteristics at the AM level to SAM. . . . [I]n some ways it would be you wouldn't make somebody a quarterback who couldn't throw the ball."  (*Id.* at 35:5-10).  Nonetheless, RVP Hackney and others testified that Defendants sometimes permits candidates who underwhelm at SAM Leadership Week to repeat it in order "to improve on those scores to be eligible for promotion."  (Hackney Dep. Tr., ECF No. 27 at Ex. H, at 64:17-19; *see also id.* at 30:14-17; Olesh Dep. Tr., ECF No. 27 at Ex. D, 123:13-17; McChurch Dep. Tr., ECF No. 27 at Ex. F, at 29:8-12).  But in the subsequent Leadership Week the candidate has to "hit the recommendation of those skill positions to be considered for promotion . . . .  There would be no other reason for him to go back and do that." (*Id.* at 64:24-65:5).

Based on this record, no reasonable jury could find either that Defendant did not reasonably design its promotion policy to further legitimate business purposes or that it did not in

fact administer it in a way that reasonably achieves these purposes.  Accordingly, the Court will grant summary judgment in favor of Defendant as to Plaintiff's disparate-impact claim.


IV.    **CONCLUSION**

For the foregoing reasons, the Court grants in part and denies in part Defendant's motion. The Court grants summary judgment in favor of Defendant on Plaintiff's disparate-treatment claim as to the refusal to promote him and on Plaintiff's disparate-impact claim.  The Court denies summary judgment on Plaintiff's disparate-treatment claim as to his demotion.


BY THE COURT:


   /s/ Lynne A. Sitarski
LYNNE A. SITARSKI
United States Magistrate Judge